GEORGE W. DEVOTO, Appellant, v. NICHOLAS A. DEVOTO—19 S. W. (2d) 662.

Division Two, August 6, 1929.

*Taylor R. Young* for appellant.

*Abbott, Fauntleroy, Cullen & Edwards* for respondent.

HENWOOD, C.—This is a suit in equity, filed May 27, 1925, in the Circuit Court of the City of St. Louis, by George J. Devoto, against Nicholas A. Devoto, his brother, for an accounting of an alleged trust fund of $32,000 and the income derived therefrom, to declare a resulting trust in certain real estate alleged to have been purchased by the defendant with a part of said trust fund, and for an accounting of the rents and profits derived from said real estate. The chancellor made a general finding in favor of the defendant and rendered judgment accordingly. The case is here for review on plaintiff's appeal. (Virginia Mussey, sister of the plaintiff and defendant, was originally joined as a codefendant, but the cause was dismissed as to her prior to the hearing below.)

For a clear understanding of the plaintiff's alleged cause for equitable relief, it seems best to quote his petition in full, as follows:

"Plaintiff states that he and the defendants are brothers and sister; that both plaintiff and defendants reside in the city of St. Louis, Missouri; that during the *spring of 1905* and for a long time prior and subsequent thereto, the plaintiff and the defendant, Nicholas A. Devoto, whose name is Nicholas Angelo Devoto, were *co-*

*partners* and from time to time had accumulated funds from their *joint earnings* and had paid over and delivered to their mother all of their wages, and who in behalf of the plaintiff and the said Nicholas Angelo Devoto saved the same for the *joint use and benefit* of the plaintiff and the said Nicholas A. Devoto; that during said spring of 1905, the plaintiff and defendants had an aunt residing on an island in the Adriatic Sea and in the town of Lagosta therein, and who was a sister of the mother of the plaintiff and defendants, and whose name was Mary Garbina, a resident and native of Austria-Hungary; that said aunt was possessed of considerable money and real estate, a large portion of which was situated and located in the city of New Orleans, in the State of Louisiana; and plaintiff states that it was a matter of common report and repute in the family of the plaintiff and defendants that upon the death of said aunt all of her property would be willed to the mother of plaintiff and the defendants for life, and that upon the death of said mother said property would go to the plaintiff and the defendant, Nicholas A. Devoto; that for the purpose of ascertaining whether said aunt so intended to dispose of her property at her death, *it was verbally agreed between the plaintiff and the said Nicholas A. Devoto,* and in which agreement all the brothers and sisters and mother of the plaintiff and defendants concurred, *that the defendant Nicholas A. Devoto and said mother should use whatever sum or sums were necessary in order to defray the expense of a visit or trip of the said mother and the said Nicholas A. Devoto to visit said aunt in Lagosta and that whatever property that may be left or conveyed by will or otherwise to either the plaintiff or the defendant, Nicholas A. Devoto, or said mother, should be divided equally between the plaintiff and the said Nicholas A. Devoto upon the death of said aunt and upon the death of said mother.*

"Plaintiff further states that in pursuance of said agreement the *joint funds* of the plaintiff and the defendant, Nicholas A. Devoto, were used by the said Nicholas A. Devoto and said mother to finance said visit or trip from St. Louis, Missouri, to Lagosta in the Adriatic Sea as aforesaid and return, and which said expense aggregated approximately one thousand dollars, and that upon the return of the said Nicholas Devoto from said trip as aforesaid he advised this plaintiff that *all arrangements had been made* by which the aunt would convey by will her said property to the said mother of plaintiff and defendants for life and upon her death *the same would be divided equally between this plaintiff and the defendant, Nicholas Devoto,* and plaintiff states that thereafter said *co-partnership arrangement* continued between the plaintiff and the defendant, Nicholas A. Devoto, until on or about the first day of *January, 1920,* at

which time said partnership between the plaintiff and the defendant, Nicholas A. Devoto, ceased, and the plaintiff was advised that the defendants had made a trip to New Orleans, Louisiana, at the expense of said co-partnership, for the purpose of converting the property of said aunt, who had previously departed this life, into cash, for the joint purpose and use of the plaintiff and defendant, Nicholas A. Devoto, as aforesaid; that on or about the —— day of *August, 1920,* the plaintiff learned for the first time the defendant Nicholas A. Devoto had obtained all of said property in New Orleans, Louisiana, belonging to said aunt, *for his own use and intended to exclude the rights of this plaintiff in and to said property,* whereupon *the co-partnership* of the plaintiff and defendant aforesaid was dissolved and all communication between the plaintiff and the defendants ceased; that the mother of the plaintiff and defendants departed this life in the summer of 1913, and the defendants converted said property of said aunt in New Orleans, Louisiana, into cash sometime during the year of 1922, and have kept and retained and still keep and retain the proceeds thereof; that said proceeds were, by the defendants, sometime between the first of January, 1922, and the present time, invested in the following described real estate, lying, being and situate in the city of St. Louis and State of Missouri, and more particularly described as follows, to-wit:

"Lots 24, 25, 26 and 27 in City Block 3626 of the city of St. Louis, Missouri, having a frontage of 162 feet on the east line of Vandeventer Avenue and a frontage on the north line of Labadie Avenue of 115 feet more or less, and being the northeast corner of Vandeventer Avenue and Labadie Avenue in the city of St. Louis, Missouri, and upon which said real estate is situated and located two double brick apartment buildings, each building containing four apartments and being numbered 3861 Labadie Avenue and 3014 N. Vandeventer, each in the city of St. Louis, Missouri.

"That the defendants have been collecting the rents and profits from said apartment buildings since the date of their construction about six months last past and have been converting the proceeds to their own use and have failed and refused and still refuse to account to the plaintiff for his proportion of said proceeds derived from the sale of said real estate in New Orleans, Louisiana, formerly belonging to the aunt of the plaintiff and defendants, and which plaintiff avers, upon information and belief and states upon such information the fact to be, that the proceeds derived from the sale of said New Orleans, Louisiana, real estate was and is approximately thirty-two thousand dollars; plaintiff further states that he has no adequate remedy at law and without the aid of the strong arm of a court of equity, he will suffer irreparable injury in this, that he

will be unable to compel the defendants to account to him for one-half of the proceeds derived from the sale of said real estate, located in New Orleans, Louisiana, aforesaid, formerly belonging to his said aunt, aforesaid.

"The premises considered, plaintiff prays that the court order an accounting between the plaintiff and the defendants for the proceeds derived from the sale of said real estate, formerly belonging to the aunt of the plaintiff and defendant, and that said trust fund now in the possession of the defendants be followed into the real estate hereinbefore described; that the defendants be compelled to account to the plaintiff for one-half of the said trust fund, together with all income thereon from the date which the defendants acquired the same to date; that the title to the foregoing described real estate be divested out of the defendants to the extent of one-half thereof and vested in this plaintiff and that the defendants be compelled to account for one-half of the rents and profits derived from the operation of said real estate from the time said trust funds were invested therein to date, and that this honorable court will order the said real estate sold and the proceeds divided equally between the plaintiff and the defendant, Nicholas A. Devoto, and that this honorable court will award to the plaintiff, such other and further relief in the premises as shall seem meet and proper, the plaintiff offering to do equity in the premises." (Our italics.)

The answer of the defendant is a general denial.

According to the undisputed facts, the plaintiff and defendant are the youngest of seven children in their family, the plaintiff being forty-seven and the defendant forty-three at the time of the trial, in March, 1926. They were compelled to quit school and go to work at an early age, in order to support themselves and their aged parents, their brothers, Charles, John and Frank, and their sisters, Katherine (Mrs. Fontana) and Virginia (Mrs. Mussey), having married and left the family fireside when the plaintiff and defendant were in their teens. Their wages were turned over to their mother, who attended to the business affairs of the household, paid the bills, and kept an account of their savings. In 1908, she bought a home for the family in St. Louis, paid $700 on the purchase price thereof out of their savings, and took the title thereto in their names. She acted as their banker until the time of her death, in 1913. Their father died in 1914. In 1905, their mother and the defendant spent several months visiting in the home of their mother's sister, Mrs. Mary Garbina, on the Island of Lagosta in the Adriatic Sea. Mrs. Garbina was a widow and quite wealthy. In addition to considerable property in her native land, she owned certain real estate in New Orleans, Louisiana, where she and her husband had formerly

lived. In 1916, she died, and by her will, dated "Dec. 13/15", left to the defendant her real estate in New Orleans and "money, values and bonds and the like deposited with the Banca Commerciale Triestina in Trieste." The remainder of her estate was left to her niece, Christine, daughter of another deceased sister, and the "Parochial Church of Lagosta." When the defendant received a copy of his aunt's will and the plaintiff learned of its contents (in 1916 or 1918), they quarreled and were never on friendly terms again. In 1920, the defendant went to New Orleans and, after his return to St. Louis a year or two later, lived in the home of his sister, Mrs. Mussey. He sold the New Orleans property in 1921 or 1922, and, in 1923, bought the St. Louis real estate which is involved in this suit. The plaintiff continued to live in the home property, and, on August 28, 1924, filed a suit against the defendant for partition of that property and for an accounting of rents and profits and advancements made in payment of loans, taxes and repairs. The hearings before the referee in that suit began on May 25, 1925, and, on May 27, 1925, as above stated, he filed this suit against the defendant.

The plaintiff testified that his wages and the defendant's wages were kept together by their mother and that she also kept their savings in a joint fund. After their mother's death, in 1913, they continued to keep their wages and savings in a joint fund until the time of their quarrel, in 1918. Before their mother and the defendant went to Europe, in 1905, she had frequently expressed her desire to visit her sister, Mrs. Garbina, and her hope of sharing more liberally in her sister's estate, as the result of her visit. It was also her desire that he and the defendant should share equally any property left to her by her sister, because of their faithfulness in supporting and in caring for her and their father. She proposed that, if he and the defendant would allow her to use their joint savings of $800 to pay the expenses of her trip to Lagosta to visit her sister, any inheritance received by her or either of them out of her sister's estate, or any property left to her or either of them by her sister, be divided between him and the defendant in equal shares. He and the defendant accepted this proposal, and she and the defendant made the trip to Lagosta and visited her sister, with that understanding and agreement. All of their brothers and sisters knew of this agreement and made no objection to it. Their mother selected the defendant to go with her because "he was more talkable amongst the women folks." To pay the expenses of this trip, their mother and the defendant used his and the defendant's joint savings of $800 and the additional sum of $200, which he sent to them, upon their request. He borrowed the $200 from his sister

Katherine (Mrs. Fontana), and the loan was paid, later on, out of his and the defendant's joint savings. Upon returning from this trip, their mother said: "My sister told me I will be sole heir and you two boys will get this." And the defendant said: "We would get it." This expectation was discussed repeatedly among the members of the family and all of their brothers and sisters knew about it. He first learned of his aunt's will in 1918. When asked what the defendant said about giving him any part of the property left to the defendant by his aunt, he replied: "He said she left it to him and I don't get anything, and that was why we broke up and I said, 'Well, you have got the swag, now keep it,' and he grabbed a bucket of paint and said, 'I will throw this in your face.'" In connection with his testimony, the plaintiff offered in evidence a warranty deed, dated October 15, 1923, and reciting a consideration of "$100 and other valuable considerations," by which Virginia Mussey conveyed to the defendant the north 38 feet of Lots 25, 26 and 27 and the north 38 feet of the west 15 feet of Lot 24 in City Block 3626 of the city of St. Louis, the same being a part of the lots described in plaintiff's petition. And the plaintiff further testified that the defendant built "a four-family flat" on the part of these lots described in said warranty deed, about two or three years before the trial.

The plaintiff's sister Katherine (Mrs. Fontana) lived in the family home from the time of her husband's death, in 1900, until the time of the trial. She corroborated the testimony of the plaintiff in every important matter. She testified that their mother always kept the plaintiff's and defendant's wages and savings together in a joint fund, and that, after their mother's death, they continued to keep their wages and savings in a joint fund until the time of their quarrel. Her testimony was the same, in effect, as the plaintiff's as to the agreement that the plaintiff and defendant would pay the expense of their mother's trip to Lagosta out of their joint savings and share equally any property left by their aunt to their mother or either of them, and as to the favorable report made by their mother and the defendant, upon their return from Lagosta. She said her sister and all of her brothers knew of this agreement and frequently talked about it. On cross-examination, she admitted that she learned in 1916, a few months after her aunt's death, that some of her aunt's property was left to the defendant, and that she and the plaintiff "didn't say anything" when a copy of her aunt's will was read to them. She also admitted that she "sided" with the plaintiff in his suit for partition of the home property, and that she had not been "speaking" to her sister and her other brothers for sometime before the trial.

The plaintiff offered in evidence a part of the testimony given by the defendant in the partition suit. In that testimony, the defendant said that, after their mother bought the home property, in 1908, his wages and the plaintiff's wages were given to their mother and used to pay the household expenses and the loans, taxes and repairs on that property; that their wages were turned over to their mother and "split fifty-fifty;" that, after their mother's death, they kept their wages together, in a trunk for awhile, and, later, in a safety-deposit box at the Mercantile Trust Company; and that they became estranged and quit keeping their money together in the fall of 1916 or the first part of 1917.

The plaintiff also offered in evidence the testimony given by Francis Leo Murphy in the partition suit. In that testimony, this witness said that he was connected with the safety-deposit department of the Mercantile Trust Company; that the records of the company showed that the plaintiff and defendant had safety-deposit boxes there from 1909 to 1918; and that another box "was rented under George J. and Nicholas A. Devoto, January 24, 1907," and retained "until January 26, 1918."

According to the testimony of the defendant, he and the plaintiff turned over their wages to their mother, but she kept their wages separately and kept a separate account of their savings. He says: "She took so much for our room and board and tried to save as much as she could for us." Their mother talked to all of her children about visiting her sister, Mrs. Garbina, for a long time prior to 1905. She asked him to go with her and he consented. Neither she nor any of the children ever said anything about her inheritance from her sister's estate, or about property that might be left to her or her children by her sister. There was no agreement nor understanding between their mother and him and the plaintiff about giving him and the plaintiff the property that might be left to their mother or to either of them, and nothing of the kind was discussed by them, either before the trip to Lagosta or thereafter. No such agreement was ever mentioned by any member of the family, and the plaintiff never made any such claim, until he filed this suit. He paid his expenses on the trip to Lagosta out of his own money and his mother paid her expenses out of her own money. The plaintiff did not send them any money nor did they request him to do so. But, while they were in New York, after returning from Europe, their mother requested her daughter Katherine (Mrs. Fontana) to send her $50 as an advancement on her daughter's board bill. This was done, and their mother used this money in buying souvenirs for the children of her daughters, Katherine (Mrs. Fontana) and Virgina (Mrs. Mussey). He received a copy of his aunt's will in the

latter part of 1916, which was written in the Italian language. His sister Katherine (Mrs. Fontana) read it in its original form, and later he procured an English translation of it and it was read to the whole family. He sold the New Orleans property in 1921 or 1922 and realized $10,000 net out of the sale of it. He used $7,000 of this money, in 1923, in buying the lots and in erecting the "four-family flat" involved in this suit. The cost of the apartment building was $16,500. At the time it was built, he obtained a loan of $11,500 and gave a mortgage on the property as security for the payment thereof. When the home property was bought in 1908, their mother used $350 of his savings and $350 of the plaintiff's savings in making the initial payment of $700 thereon. He never split his savings "fifty-fifty" with the plaintiff, and did not so testify before the referee in the partition suit. He did not read the testimony given by him in that suit after it was transcribed. He never quarreled with the plaintiff, but they "ceased speaking" after the time the plaintiff said "certain things" to him.

The defendant's testimony was corroborated by the testimony of his sister Virginia (Mrs. Mussey) and his brothers Frank and John, and by the deposition of his brother Charles, who died shortly before the trial. All of them testified that, while their mother's long-desired visit with her sister was repeatedly discussed by the family, they never heard anything said about their mother's inheritance out of her sister's estate, either before or after her trip to Lagosta; that they never heard, until the plaintiff filed this suit, of the alleged agreement, whereby the plaintiff and defendant were to share equally any property left, by their aunt, to 'either of them or their mother; that, when their mother visited her sister in 1905, she had some money of her own, which she made out of a dry goods store operated by her and her daughter Katherine (Mrs. Fontana), and that she was financially able to pay her own expenses on the trip; that, shortly before their mother and the defendant started on their trip to Lagosta, they attended a family reunion in the family home and all of the children were present, except Katherine (Mrs. Fontana); that, on that occasion, each of them gave their mother $50 to spend on the trip; that all of the children assisted in paying the expenses of this trip, and also in paying their mother's funeral expenses, in 1913, except the plaintiff and their sister Katherine (Mrs. Fontana); and that they (the plaintiff and Katherine) had displayed an unfriendly attitude toward the defendant and all of them for several years prior to the trial. The defendant's brother Charles further testified, in his deposition, that the defendant was "named" for his uncle, Mr. Garbina, and that his aunt, Mrs. Garbina, was the defendant's "God-mother," that, "when the will came, we spoke how lucky Nick (the

defendant) was;'' and that the plaintiff made no claim, at that time, to any part of the property left to the defendant by his aunt; ''he seemed to be pleased like the balance of us.''

In rebuttal for the plaintiff, his sister Katherine (Mrs. Fontana) said that her mother never contributed any money to the dry goods store, nor realized any income therefrom; and that she did not know whether her mother made any money out of the flower shop operated in connection with the dry goods store.

The plaintiff offered in evidence, in rebuttal, the depositions of the defendant, his brothers Frank and John, and his sister Virginia (Mrs. Mussey), taken by the plaintiff a few days before the trial. The testimony given by these witnesses in their depositions is substantially the same, as to all material matters, as the testimony given by them at the trial, which is stated above, but no inquiry was made at the trial concerning some matters referred to in the defendant's deposition. It appears in his deposition that he received all rents realized out of the New Orleans property from the time of his aunt's death in 1916 until the time of the sale of that property in 1921 or 1922, but the amount so received is not shown. It also appears in his deposition that some bonds and money in the ''Bank of Trieste'' had been transferred to his name on the books, but he was awaiting an increase in their value before withdrawing either the bonds or money from the bank. He said he was not advised as to the face value nor the market value of the bonds. He also said the amount of the money is ''30,000 colon,'' but did not know the market value of a colon in English money at the time his deposition was taken.

The plaintiff also offered in evidence, in rebuttal, the report of the referee in the partition suit and the defendant's exceptions thereto, but both were excluded upon the objection of the defendant.

I. Learned counsel for the appellant charges error on the part of the chancellor in excluding the testimony given by the defendant before the referee in the partition suit and the report of the referee and the defendant's exceptions thereto. Manifestly, counsel had forgotten, at the time he prepared his brief, that the chancellor admitted the testimony given by the defendant before the referee in the partition suit. This testimony, or the portion of it which counsel read into the record, is shown, in substance, in the above recital of the facts. It is admissible in this case only because it contains some statements, which are contradictory, to some extent, to some of the statements made by the defendant at the trial of his case. The report of the referee in the partition suit and the defendant's exceptions thereto must be considered together,

because, when disconnected from the referee's report, the exceptions thereto are unintelligible. It is conceded that the report of the referee in the partition suit and the exceptions thereto had not been passed upon by the court at the time they were offered in evidence in this case, and that therefore they were not offered on the theory of *res adjudicata,* as to any material facts in this case. In that situation, they were clearly incompetent for any purpose and properly excluded by the chancellor. Moreover, if competent, they would not change our conclusion on the merits of the case, nor would the exclusion of such evidence, if erroneous, change the result of the case on this appeal. As a general rule, our appellate courts do not reverse judgments in equity cases because of errors in the admission and exclusion of evidence, but consider all of the competent evidence offered and base their conclusions thereon. [Nordquist v. Nordquist (Mo. Sup.), 14 S. W. (2d) l. c. 588, and cases cited.]

II. It is also urged that the judgment rendered below is for the wrong party. We do not agree with counsel in this contention. The plaintiff's right to the relief sought rests entirely upon the alleged agreement that he and the defendant would allow their mother to use their joint savings of $800 in paying the expenses of her trip to Lagosta and her visit with her sister in 1905, and that he and the defendant would share equally any property left to their mother, or to either of them, by her sister. As to whether or not the plaintiff and defendant had a joint savings fund in 1905, the evidence presents a sharp conflict. But, conceding for the sake of the argument, that their savings were kept together for their joint use and benefit at that time, we are confronted with the more serious question of whether or not the plaintiff has established the alleged agreement. On this issue, the testimony of the plaintiff is supported only by the testimony of his sister Katherine (Mrs. Fontana), who admits that she "sided" with the plaintiff in the partition suit and that she had not been "speaking" to the defendant, nor her sister Virginia (Mrs. Mussey), nor her brothers Charles, Frank and John, for sometime before the trial, while the defendant's denial of the alleged agreement is supported by the testimony of his sister Virginia (Mrs. Mussey) and his brothers Charles, Frank and John. They testified that no such agreement was ever made, or even discussed, and that they never heard of any such claim by the plaintiff until he filed this suit. The defendant says that his mother paid her expenses of the trip to Lagosta out of her own money, and his sister and three brothers, above mentioned, say that their mother had some money of her own, at that time, and that each of them gave her $50 to spend on the trip. The plaintiff admits that,

when he learned of his aunt's bequest to the defendant, he said to the defendant: "Well, you have got the swag, now keep it." And, although he knew in 1916 or 1918 of the property so bequeathed to the defendant, he asserted no claim to any part thereof until he filed this suit, on May 27, 1925, three or four years after the defendant had sold the New Orleans property, left to him by his aunt, and nine months after he filed the suit against the defendant for partition of the home property. The defendant was "named" for his aunt's husband. She was his "Godmother." He accompanied his mother on the long trip to Lagosta and her last visit with his aunt. Naturally, after his mother's death, he was his aunt's favorite in the Devoto family, and her selection of him as one of the beneficiaries of her estate needs no further explanation. Considering the evidence as a whole, we think the plaintiff has failed to prove the alleged agreement, or any such agreement or understanding, by the greater weight of the evidence, or by such clear and convincing evidence as a court of equity should require.

Having reached this conclusion, it becomes unnecessary to consider the other questions presented in the brief and oral arguments of counsel. The ground upon which the chancellor based his finding for the defendant is now a matter of no importance. The judgment rendered below is for the right party and should be affirmed. It is so ordered. *Davis* and *Cooley, CC.,* concur.

PER CURIAM:—The foregoing opinion by Henwood, C., is adopted as the opinion of the court. All of the judges concur.